FILED IN THE
U.S. DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

Apr 12, 2022

SEAN F. McAVOY, CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| KELLY O'KELL, | No. 2:18-CV-00279-SAB |
| Plaintiff, | |
| v. | |
| DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| Defendant. | |

A bench trial was held in the above-captioned matter in Spokane Washington from November 1-5, 2021; February 14-18, 2022; and concluded on February 23, 2022. Plaintiff was represented by Matthew Crotty and Michael Love. Defendant was represented by John Drake, Joseph Derrig, and Molly Smith.

Having fully reviewed the materials submitted by the parties and the record in this matter, the Court enters the following Findings of Fact and Conclusions of Law pursuant to Federal Rule of Civil Procedure 52(a).

### Findings of Fact

1.  In July 2014, Plaintiff Kelly O'Kell was hired by the Bureau of Reclamation ("Bureau"), a federal agency under the U.S. Department of the Interior, as a Realty Specialist. She was hired at the GS-11 level.

2.  Plaintiff worked in the Bureau's Ephrata Field Office ("EFO").

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 1

3.      From July 2014 through May 25, 2016, Plaintiff received no disciplinary actions, and there were no behavior issues reported by any of her co-workers. During this time, she received regular pay raises, cash bonuses, and excellent performance reviews. Plaintiff also received cash bonuses, pay raises, and positive performance evaluations after May 2016, which is inconsistent with the testimony of her supervisors that her performance was unsatisfactory between May 2016 and her termination in 2018.

4.      All of these pay raises, bonuses, cash awards, and positive performance evaluations are inconsistent with the claim made by Defendant that Plaintiff was terminated for performance and behavior issues.

5.      From July 2014 through May 25, 2016, Plaintiff was never told by her supervisors that her emails were inappropriate.

6.      During the time that Plaintiff worked at the Ephrata Field Office, there were several discrimination related complaints made by employees there. Some of the complainants, not just Plaintiff, claimed that the managers at the EFO used phrases such as "we need young blood" or "we need to bring in a new generation" or "when are you planning to retire" or "older workers don't go with the flow." Approximately 30-40 discrimination complaints were filed by employees of the EFO, most during the time that Plaintiff worked there.

7.      Kathy Hernandez, the former Equal Employment Opportunity ("EEO") Specialist for the Bureau, testified that she worked on approximately 30 complaints from the EFO alone. Asked if she was concerned about the number of discrimination, harassment, and retaliation complaints, Ms. Hernandez said, "Yes, that is a concern. Concern to me, concern to my supervisor."

8.      Dawn Wiedmeier, the Area Manager for the Bureau, was not aware that 30-40 complaints of discrimination were filed involving the managers at the EFO, but she was not concerned by that number. In fact, she thought that this was a good sign because it was evidence that disgruntled employees understood how

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 2

to file complaints. She did not inquire about the nature of the complaints or how they were resolved or even if they were resolved. At trial, she explained that the EFO was an "old boys' network" and she wanted to hire new people and create a new culture within the office. She admitted that she discussed this hiring goal with Clint Wertz, the Field Office Manager for the EFO. Ms. Wiedmeier was Mr. Wertz's supervisor.

9.      At trial, Mr. Wertz testified that he was concerned the EFO was losing experienced people, but this is inconsistent with his actions of favoring new, inexperienced, and younger people, such as Sarah Maciel and Charity Davidson, and his decisions not to promote experienced existing employees such as Plaintiff and Gina Hoff.

10.      Plaintiff claims that Mr. Wertz told her in early 2017 that he would never hire a female over the age of 50.

11.      Additionally, Anthony Ortiz asked Plaintiff several times about her retirement plans, to which she replied, "I have to work another 15-20 years; please stop asking me that." Mr. Ortiz was Plaintiff's direct supervisor at the EFO.

12.      In May 2016, Plaintiff applied for a newly created and vacant Project Manager position at the EFO. This position was rated as GS-11 or GS-12. The person selected for the job would be supervised by Clint Wertz. The new position was advertised as requiring work mostly within the office at the EFO.

13.      Mr. Wertz encouraged Plaintiff to apply for the job and told that she was qualified for the position.

14.      Mr. Wertz was the deciding official for the Project Manager position, meaning that the hiring decision was his alone to make.

15.      Mr. Wertz convened an interview panel to assist him in interviewing the candidates for the Project Manager job. The panel consisted of himself, Toni Turner, and Sarah Maciel.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 3

16.     Two candidates were selected for an interview: Plaintiff and Charity Davidson. Ms. Davidson was younger than Plaintiff and did not work for the Bureau at the time of the interviews.

17.     Plaintiff was 56 years old when she applied for the job. Ms. Davidson was under 40 years old.

18.     Sarah Maciel was a GS-9 at the time she sat on the Project Manager interview panel, which took place in early May 2016. As a GS-9 employee, it would have been unusual for her to be selected as a member of the panel. She did not have previous experience serving on an interview panel.

19.     The interview panel did not use a formal scoring or ranking matrix.

20.     Clint Wertz alone made the choice to hire Charity Davidson. In short, though an interview panel was convened, the hiring decision was made by Mr. Wertz. He did not consult with the panel members when he made his decision.

21.     Mr. Wertz discouraged another older female applicant, Gina Hoff, from applying for a different project manager position in the EFO. At the time, Ms. Hoff already possessed a Project Manager certification along with the GS-12 rank required for the position. Ms. Hoff explained that she planned to apply, but that Mr. Wertz discouraged her and told her she would not get the job.

22.     Mr. Wertz decided not to hire Plaintiff despite several excellent recommendations and an internal reference from Anthony Ortiz, Plaintiff's direct supervisor. Ms. Davidson was hired and was allowed to telework from her home in Wenatchee, even though the job as advertised required working at the EFO.

23.     Both candidates (Ms. Davidson and Plaintiff) had at least one negative reference from previous employers.

24.     On May 19, 2016, Clyde Lay called Plaintiff—who was attending a work-related conference with co-workers in Boise, Idaho—and informed her that she was not selected for the Project Manager position. Mr. Lay was Mr. Wertz's deputy at the EFO. Mr. Lay was not part of the interview panel but called Plaintiff

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 4

at the request of Mr. Wertz. Mr. Lay told Plaintiff that she was not "the best fit" for the Project Manager position.

25.    On the same day, Mr. Wertz approved a Star Award for Plaintiff that included the following language: "Kelly has demonstrated a complete knowledge of each facet of realty and has taken on waiver valuation training for eventual certification. Kelly works with other groups within EFO, area and region, to find customer solutions. Kelly has been working successfully in conjunction with operations area to develop and implement improved processes, SOP, between EFO interoffice groups and water districts. The SOP development will benefit all of the EFO and could possibly be a template for other offices in the region. Kelly is an asset to the realty group and remains an example of knowledge, quality, and extra effort for all." Yet, Mr. Wertz still decided to hire the other candidate who had no previous federal employment experience.

26.    Plaintiff attended a dinner that evening with co-workers Sarah Maciel and Corbin Gentzler. According to Plaintiff, Ms. Maciel explained that, although the two candidates were "pretty equal" in qualifications, Mr. Wertz selected Charity Davidson because she would bring new energy to the office. Plaintiff also believed that Ms. Maciel used the phrase "young and perky" to describe Ms. Davidson.

27.    Neither Ms. Maciel nor Mr. Gentzler directly disputed the "young and perky" comments.

28.    Rather, in an affidavit signed on December 15, 2017, Ms. Maciel claimed that she "did not recall" using the phrase "young and perky."

29.    On May 25, 2016, Plaintiff filed an informal EEO complaint related to her non-selection for the Project Manager position, alleging disparate treatment based on sex and age (over 40). EEO Specialist Kathy Hernandez did the counseling intake. EFO management was informed of Plaintiff's complaint the

**FINDINGS OF FACT AND CONCLUSIONS OF LAW # 5**

same day it was made. Plaintiff's managers at the EFO immediately began to treat her differently than before the complaint was made.

30.    On May 31, 2016, Ms. Maciel complained to her supervisor, Anthony Ortiz, that Plaintiff engaged in inappropriate conduct towards her on both April 19, 2016, and May 19, 2016. This was the first time that Ms. Maciel had complained about the incident on April 19—and in fact, one or two weeks after that incident Ms. Maciel had asked Plaintiff to watch her young children for the weekend. No credible explanation was offered regarding (1) why Ms. Maciel was upset about an incident involving Plaintiff on April 19 yet did not report it until May 31 and also (2) why, in the interim, Ms. Maciel asked Plaintiff to babysit her children for an entire weekend.

31.    On June 2, 2016, Mr. Ortiz suspended Plaintiff's teleworking privileges. This came as a surprise to Plaintiff because Mr. Ortiz had authorized her to telework as recently as May 25, 2016, which was before he knew that she was concerned about age discrimination. Plaintiff complained to Dawn Wiedmeier that this action was retaliatory.

32.    On July 21, 2016, Mr. Ortiz issued a Letter of Reprimand to Plaintiff for inappropriate conduct. This was in response to Ms. Maciel's complaint.

33.    On July 27, 2016, Plaintiff sent written objections to the Letter of Reprimand. She also sent an email to Ms. Wiedmeier complaining that the Letter of Reprimand was in retaliation for her filing an informal EEO complaint on May 25, 2016.

34.    On August 24, 2016, Mr. Ortiz upheld the decision to issue the Letter of Reprimand.

35.    On August 25, 2016, Plaintiff filed a formal EEO complaint claiming age discrimination.

36.    The EEO investigation did not begin until almost a year after it was filed, even though it was required to be completed within 180 days. Plaintiff never

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 6

received an explanation for this delay. Her frustration regarding her discrimination related complaints began to grow and fester.

37.    On August 31, 2016, Kathy Hernandez completed the counseling report regarding the EEO complaint filed by Plaintiff. In her notes, Ms. Hernandez quoted Mr. Ortiz as explaining that another management official at the EFO instructed him to punish certain individuals, but he was unwilling to disclose the name of the individual who gave him this order.

38.    On April 28, 2017, Mr. Ortiz encouraged Plaintiff to consider going through the chain-of-command with any issues before contacting the EEO or the Regional Office.

39.    On May 12, 2017, the Bureau issued an acceptance letter for several age discrimination and hostile work environment claims made by Plaintiff, including (a) the decision in May 2016 not to promote her into the Project Manager position; (b) the decision to terminate her telework privileges on June 2, 2016; (c) the decision that she was absent without leave in July 2016; (d) the written reprimand letter issued on July 21, 2016; (e) questions and comments by her supervisor Anthony Ortiz about her age and retirement plans; and (f) rude and unprofessional treatment by co-worker Sarah Maciel.

40.    During the first week of July 2017, Mr. Ortiz and another co-worker were killed in unrelated accidents. The formal EEO investigation regarding Plaintiff's complaints had not yet been started so these witnesses were never interviewed. The EEO investigation process should have been completed by this time.

41.    Following these tragic deaths, tensions in the office escalated.

42.    In late July 2017, Clyde Lay told Plaintiff that "I've got you now." The implication was that he would now be able to terminate Plaintiff because Mr. Ortiz was no longer available to protect her.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 7

43.     On August 9, 2017, the Bureau finally started the EEO investigation regarding Plaintiff's discrimination-related complaints. This was a year after the complaints had been filed, and three months after the Bureau issued the acceptance letter, which essentially determined probable cause to investigate. Defendant did not offer an acceptable explanation for this unreasonable and unacceptable delay. The investigation was assigned to EEO Investigator Michael Brown. It is unclear if Plaintiff was notified of this development. However, August 14, 2017, was a busy day for both Plaintiff and her managers.

44.     On August 14, 2017, Plaintiff sent an email to Regional Director Lorri Lee and alleged ongoing inappropriate treatment, including age discrimination and retaliation.

45.     On August 14, 2017, Kip Stover, a supervisor with the Human Resources department, drafted a letter for Clyde Lay for the purpose of terminating Plaintiff because she sent some emails in July that her managers thought were inappropriate.

46.     On August 14, 2017, Mr. Lay sent an email to Plaintiff and made the following offer: "I would remove the [July 2016 letter of reprimand] from your file if you were to accept a job outside of this office. You would need to bring me a signed acceptance letter and I would have the letter of reprimand removed before you were transferred to another agency or resigned to take employment with a private employer or a state government."

47.     Plaintiff refused that offer.

48.     EEO Specialist Kathy Hernandez later described this offer as unacceptable:

        A: I have never seen this [email from Clyde Lay] before… but that is unacceptable.

        Q: Why is it unacceptable as an EEOC specialist?

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 8

A: To me, that would be considered *retaliation.* Why would he tell her he would remove that letter if she were to take another job?

49.     On September 13 and 14, 2017, two employees from the Human Resources department, Kip Stover, and Nate Shimatsu, interviewed Plaintiff and other witnesses regarding the complaint Plaintiff made to Lorri Lee on August 14, 2017.

50.     On September 17, 2017, Clyde Lay issued a proposed 3-day suspension letter to Plaintiff. Mr. Stover helped Mr. Lay draft the letter.

51.     On September 21, 2017, Plaintiff submitted written objections to the proposed suspension.

52.     On September 29, 2017, Plaintiff provided a response to the proposed suspension to Carolyn Chad, the Deputy Area Manager. Ms. Chad had final decision-making authority regarding the proposed suspension.

53.     On October 24, 2017, Plaintiff had her annual performance evaluation and received some low ratings because of emails she sent that her supervisors thought were inappropriate.

54.     On October 27, 2017, the Bureau issued an amended acceptance letter for the additional retaliation claims made by Plaintiff in May 2017.

55.     On November 8, 2017, Carolyn Chad upheld the 3-day proposed suspension. Plaintiff served the suspension from November 15-17, 2017.

56.     On February 8, 2018, Michael Brown completed his EEO investigation regarding the complaints filed by Plaintiff in 2016. He issued a report, but he did not issue any findings or conclusions. In fact, Defendant has never issued any findings or conclusions.

57.     On February 8, 2018, Marc Maynard started as the Field Office Manager for the EFO, replacing Clint Wertz. Mr. Maynard did not have any prior

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 9

experience working with Plaintiff, but within a very short period, he started the process to terminate her from federal employment.

58.     On February 26, 2018, Karissa Fromm and Barb Gentry, Plaintiff's co-workers, submitted complaints about Plaintiff to Kip Stover.

59.     On March 8, 2018, the Bureau hired Hayward Reed, a private investigator, to investigate the complaints filed by Ms. Fromm and Ms. Gentry.

60.     On March 14-15, 2018, Mr. Reed interviewed witnesses and gathered affidavits as part of his investigation.

61.     On March 18, 2018, Plaintiff discussed concerns she had about workplace harassment and retaliation with Marc Maynard.

62.     Mr. Maynard requested follow-up information about Plaintiff's concerns in writing, which she was unable to provide. Instead, on March 30, 2018, Plaintiff responded to Mr. Maynard's information request by email, telling him, "You have all the information you need in the records at your managers' office. … They … refuse to provide me with the allegations that were investigated about me. I do not have the info." Some of the comments in Plaintiff's email were insulting to Mr. Maynard.

63.     Mr. Maynard did not respond to Plaintiff's concerns about ongoing age discrimination and retaliation.

64.     On March 28, 2018, Hayward Reed issued his fact-finding report.

65.     On April 2, 2018, the Human Resources department sent Plaintiff a summary of administrative investigations of her complaints made on August 17, 2017, and October 30, 2017.

66.     On April 3, 2018, Plaintiff responded that this investigation summary did not address the EEO crisis in the EFO.

67.     On April 11, 2018, Kip Stover sent a copy of the Hayward Reed investigation report to Clyde Lay, Marc Maynard, and others. There is no evidence he sent a copy of the report to Plaintiff.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 10

68.    On May 14, 2018, Mr. Maynard issued a proposed removal letter to Plaintiff. Mr. Maynard claimed that he did not ask others for any input as to whether Plaintiff should be removed from federal service. However, he stated that he did receive a "lot of unsolicited suggestions or advice from a number of people."

69.    On May 22, 2018, Kip Stover and Dawn Wiedmeier exchanged emails about Plaintiff in which Ms. Wiedmeier thanked Mr. Stover for his help in dealing with Plaintiff and noted that "there's a light at the end of the tunnel" regarding the matter.

70.    On June 13, 2018, Plaintiff responded to the proposal removal letter from Mr. Maynard and indicated it did not address her complaints regarding age discrimination and retaliation.

71.    Mr. Maynard did not read Plaintiff's written rebuttal to the proposed removal letter. He explained that it would be inappropriate and unusual for him to do so. He did not explain why it would be inappropriate for him to consider the response from a long-term employee before making a final recommendation to terminate that person's employment.

72.    On July 18, 2018, Dawn Wiedmeier upheld the proposed removal from Mr. Maynard and terminated Plaintiff. She made the decision without consulting with Mr. Maynard. Also, at the time she made the decision, Ms. Wiedmeier thought the EEO investigation into Plaintiff's discrimination complaints had concluded with "no findings." She was wrong. The investigator had not made any findings or conclusions—and no such findings or conclusions have ever been made.

73.    Deborah Diamond is a former EEO Officer for the Internal Revenue Service. Ms. Diamond has conducted investigations of both formal and informal complaints and she has extensive knowledge of federal government human resource policies and procedures. As part of her review of this case, she reviewed

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 11

the relevant pleadings and the material and information exchanged during discovery.

Specifically, Ms. Diamond was asked to evaluate the adequacy of the investigation conducted by the Bureau in response to the discrimination related complaints filed by Plaintiff. Her opinions, which follow, were shared with the Court:

> a.     *The EEO Investigation was not timely.*

The Department of the Interior allowed 349 days to elapse from the date Kelly O'Kell filed a formal EEO complaint to the date an authorization letter was issued to an outside EEO investigator. An additional 183 days elapsed before the Report of Investigation (ROI) was issued. No final decision has been issued to date.

In contrast, when Kelly O'Kell was the Respondent in the harassing-conduct complaints filed by Karissa Fromm and Barb Gentry, the Bureau of Reclamation hired an external investigator within 11 days; a Report of Investigation was issued within 31 days; and a decision (proposed termination of Kelly O'Kell) was issued within 36 days.

> b.     *The EEO Investigation was not impartial.*

In the investigatory interviews for Kelly O'Kell's 08/14/2017 and 10/30/2017 harassing conduct complaints, Kip Stover and Nate Shimatsu asked witnesses about Kelly O'Kell's conduct, as opposed to asking witnesses about whether Kelly O'Kell had been harassed by management based on age or retaliation for protected activity.

The Investigators failed to conduct interviews in a way that would have permitted them to reach an impartial determination on the merits of Kelly O'Kell's discrimination and retaliation complaints.

The Investigators permitted management officials to testify that they "did not recall" saying/doing things that would have been detrimental to

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 12

them. A skilled investigator would have asked the witnesses to explicitly state whether they denied saying/doing what was alleged.

It is significant that several other employees in the Ephrata Field Office filed EEO complaints alleging disparate treatment based on age against the same management officials. A reasonably skilled and prudent investigator would have documented the existence and particulars of these potential comparators.

c.    *The Investigators were not impartial.*

The Bureau of Reclamation's selection of Kip Stover as one of the investigators did not meet complaint procedure assurance that the investigator would be "impartial" and an "uninvolved" Human Resources representative.

Employee and Labor Relations Manager Kip Stover was assisting management in preparing a proposed 3-day suspension of Kelly O'Kell that was issued on the same day (09/14/2017) that she was interviewed by Kip Stover regarding her 08/14/2017 harassment and retaliation complaint against the same management.

Kip Stover was a fact witness and should not have been selected to serve as the investigator. A reasonably skilled and prudent investigator would insist upon interviewing Kip Stover given his role in assisting management with the discipline process.

d.    *The Human Resources Department had a conflict of interest.*

Kelly O'Kell's allegations presented Bureau of Reclamation's Human Resource (HR) department with a potential for a conflict of interest that should have precluded anyone in the department from serving as the investigator of Kelly O'Kell's complaints.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW # 13**

One of the basic duties of any HR representative is to ensure that managers do not engage in unlawful retaliation when disciplining employees.

This was a case for Bureau of Reclamation to hire a neutral, third-party investigator, given that allegations were leveled against managers who were working with HR to discipline and ultimately terminate Kelly O'Kell.

Instead, Kelly O'Kell was issued a proposed 3-day suspension letter (prepared by Kip Stover) the same day she was interviewed by Kip Stover regarding her 08/14/2017 harassing-conduct complaint.

For most human resource professionals, the decision to discipline Kelly O'Kell while the harassment investigation was in progress violates strong prohibitions against retaliation found in Department of the Interior internal policies and the applicable EEO laws.

e.    *There was evidence of retaliation.*

After Kelly O'Kell complained of age discrimination and filed an informal EEO complaint on 05/25/2016, Anthony Ortiz suspended Kelly O'Kell from teleworking and issued her a Letter of Reprimand dated 07/21/2016.

After Kelly O'Kell complained of age discrimination, retaliation, and harassing conduct to Lorri Lee on 08/14/2017, Clyde Lay issued her a Proposed Suspension letter dated 09/14/2017.

After Kelly O'Kell complained that the agency failed to address her EEO issues in Nate Shimatsu's Investigation Summary and Closeout dated 04/02/2018, Marc Maynard issued her a Proposed Termination letter dated 05/14/2018.

The Investigations did not thoroughly investigate or definitively conclude that management's actions were non-discriminatory or non-retaliatory.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 14

74.     Erick West is a forensic economist. Mr. West performed an analysis and investigation regarding the economic damages incurred by Plaintiff after she was terminated by the Bureau.

75.     His analysis was thorough and credible.

76.     According to Mr. West, Plaintiff incurred the following economic damages:

    a.    Past lost wages and benefits from June 1, 2016 (the start date of the Project Manager position) and July 18, 2018 (the date of Plaintiff's termination) - **$15,043**.

    b.    Past lost wages and benefits from July 18, 2018 (date of termination) to February 28, 2022 (approximate trial date) - **$337,074**

    c.    Future lost wages and benefits to Plaintiff until age 72 (her planned age of retirement) - **$477,561**.

    d.    Future lost FERS Pension Benefits - **$220,380**.

    e.    Future lost Student Loan Forgiveness Benefits - **$230,113**.

    f.    Prejudgment interest - **$16,268**.

    g.    Adverse taxes on lump sum award - **$386,912**.

    h.    Total loss - **$1,683,351**.

77.     Plaintiff testified that she planned to work until age 72 because she needed that time to pay off her student loans and build some savings for retirement.

78.     Her testimony regarding retirement plans was credible.

79.     At trial, there was some dispute whether the Project Manager position was a GS-11 or GS-12 position. However, the position was advertised as GS-11 *or* GS-12 and the successful applicant, Charity Davidson, was hired and paid as a GS-12. Ms. Davidson had never been a federal employee before, whereas Plaintiff had been a successful federal employee prior to that. Economist Erick West assumed

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 15

and concluded that, if hired, Plaintiff would have been hired and paid at the GS-12 level. Mr. West's conclusion was reasonable.

80.    Plaintiff attempted to mitigate her damages by exercising reasonable care and diligence in seeking re-employment after being terminated. She was unsuccessful and remains unemployed as of the date of trial in February 2022.

81.    The Bureau had a policy of progressive discipline. The decision to terminate Plaintiff in 2018 was based, in part, on the prior discipline imposed in 2016 (Letter of Reprimand) and 2017 (3-day suspension). The 2018 removal decision may have been less severe if the prior discipline had not been imposed.

82.    Plaintiff was specific and consistent regarding her allegations of age discrimination, retaliation, and hostile work environment. In fact, most of her allegations were made in emails contemporaneous to the actual event. But many of the defense witnesses were inconsistent, specifically Clint Wertz and Sarah Maciel. For example, when asked during depositions about specific allegations made by Plaintiff, both Mr. Wertz and Ms. Maciel responded that they did not recall. However, at trial, both witnesses had better memories and denied these same allegations.

## Conclusions of Law

Plaintiff asks the Court to (1) find that Defendant has engaged in age discrimination and retaliation/hostile work environment in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*; (2) award back pay, front pay, and all attendant benefits, interest, and tax consequences; (3) award injunctive relief, specifically to remove the termination reasons from Plaintiff's SF-50 and remove the relevant letters of discipline from her personnel file; and (4) award costs and reasonable attorney's fees.

### A.    Age Discrimination

29 U.S.C. §633a of the Age Discrimination in Employment Act ("ADEA") governs age discrimination claims related to federal government employment.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 16

Specifically, the ADEA's federal-sector provision states that "[a]ll personnel actions affecting employees or applicants for employment who are at least 40 years of age . . . . shall be made free from any discrimination based on age." 29 U.S.C. § 633a(a). Personnel actions include "most employment-related decisions, such as appointment, promotion, work assignment, compensation, and performance reviews." *Babb v. Wilkie*, __ U.S. __, 140 S. Ct. 1168, 1173 (2020).

To prove a claim for age discrimination, a plaintiff must show that she (1) suffered an adverse personnel action; (2) was 40 years old or older at the time of the personnel action; and (3) the adverse personnel action was because of her age. *Shelley v. Geren*, 666 F.3d 599, 607 (9th Cir. 2012).

The U.S. Supreme Court has clarified that a plaintiff does not need to show that age was a but-for cause of the adverse personnel action to show a violation of the ADEA's federal-sector provision. *Babb*, 140 S. Ct. at 1172. However, the plaintiff must show but-for causation to obtain reinstatement, back pay, compensatory damages, or other forms of relief related to the end result of the challenged action. *Id.* at 1177. The plaintiff carries the burden of proving but-for causation, along with the other elements of her claim. *Shelley*, 666 F.3d at 608.

A plaintiff can show age discrimination through direct and/or circumstantial evidence. *See Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004). Direct evidence is defined as "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude . . . sufficient to permit the fact finder to infer that that attitude was more likely than not a motivating factor in the employer's decision." *Id.* (internal citation and quotation omitted).

The parties do not dispute the first two elements of Plaintiff's age discrimination claim—namely that she (1) suffered an adverse personnel action when she did not receive the Project Manager position; and (2) that she was 40

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 17

years or older at the time. Thus, the Court will only discuss the third element: whether the adverse employment action in this case was because of Plaintiff's age.

Here, Plaintiff has met her burden in showing that Defendant's failure to select her for the Project Manager position was because of her age. The testimony of Plaintiff and Gina Hoff, both of whom were employees over the age of 40 years old, depicted the EFO as an atmosphere where younger employees were treated differently from older employees. For example, Plaintiff testified that, in early 2017, Clint Wertz, the Field Manager of the EFO, told her that he would never hire a female over the age of 50. Consistent with this testimony, Ms. Hoff also testified that, when a natural resources supervisor position opened up in the office, Clyde Lay, Mr. Wertz's second-in-command, discouraged her from applying and told her that she would not get the job, even though Ms. Hoff already had the requisite certification and GS-level for the position. Finally, Plaintiff testified that Anthony Ortiz, her direct supervisor, asked her several times about her retirement plans even though Plaintiff was only in her 50's, despite Plaintiff repeatedly telling him "Please stop asking me that."

Even testimony from those higher up in the chain of command at the Bureau did not dispel this depiction of an ageist atmosphere. Dawn Wiedmeier, the Area Manager for the Bureau, admitted that she felt that the EFO was an "old boys' network" and that she told her subordinates, including Mr. Wertz, that she wanted to create a "whole new culture" within the office. Ms. Wiedmeier also acknowledged that she was aware there had been 30-40 complaints of discrimination, including complaints of age discrimination, against the managers of the EFO—but that these complaints did not concern her or cause her to inquire into the nature of the allegations.

The Court thus considers Plaintiff's non-selection for the Project Manager position against this backdrop. The evidence presented at trial shows that—from the time Plaintiff was hired by the Bureau in 2014 to the time that she applied for

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 18

and did not receive the Project Manager position in May 2016—she did not experience any behavioral or performance issues. In fact, because of her high-quality work within the office, Plaintiff testified that Mr. Wertz encouraged her to apply for the Project Manager position and told her that she was qualified.

However, Plaintiff was ultimately not selected for the Project Manger position. Defendant offered several explanations for why Plaintiff's non-selection was based on reasons other than her age—however, none of Defendant's explanations are credible. *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000) ("[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation.").

For one, Defendant pointed to a negative reference check from one of Plaintiff's previous supervisors to justify her non-selection. However, Charity Davidson, the candidate selected over Plaintiff, also had a negative reference check from one of her previous supervisors, who indicated that Ms. Davidson sometimes had "difficulty following management direction" and may create conflict if there was a disagreement between herself and management.

Second, Defendant stated that Ms. Davidson was hired because she had more experience than Plaintiff did. However, unlike Plaintiff, Ms. Davidson had no previous federal employment experience. Additionally, Mr. Wertz testified that, during this time, he was concerned about losing institutional knowledge due to the significant amount of employee turnover in the EFO. But, in hiring Ms. Davidson, Mr. Wertz not only chose the candidate with no internal experience, but also permitted Ms. Davidson to telework from her home in Wenatchee, thereby hindering her ability to build up experience within the office.

Finally, Defendant's argument that Ms. Davidson's interview for the Project Manager position was stronger than Plaintiff's is pretext. The evidence presented at trial created an inference that even the interview process was biased. For example, on April 27, 2016, two weeks before the Project Manager interviews

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 19

were scheduled to take place, Mr. Wertz—the hiring official for the position—sent out an email, stating that he wanted to change the members of the interview panel to substitute in Sarah Maciel. At that time, Ms. Maciel was a GS-9 employee who had only started working at the EFO in January 2016 and did not have previous experience serving on an interview panel. Notably, Ms. Maciel was also under 40 years old.

Nate Shimatsu, the Human Resources Manager for the Bureau, testified that it was unusual for a GS-9 employee such as Ms. Maciel to be placed on an interview panel for a position with a higher GS-level, such as the GS-12 Project Manager position. Mr. Wertz's selection of Ms. Maciel to be on the panel for Plaintiff's interview was even more unusual in light of the fact that Plaintiff and Ms. Maciel had just gotten into a verbal altercation the week before, on April 19, 2016. *See Earl v. Nielsen Media Rsch., Inc.*, 658 F.3d 1108, 1117 (9th Cir. 2011) (finding that a plaintiff can create an inference of pretext by showing that, in context, her employer's deviation from established policy or practice worked to her disadvantage).

Not only was Plaintiff's non-selection for the Project Manager position because of her age, but Plaintiff's age was a but-for cause of her non-selection. None of Defendant's proffered explanations for Plaintiff's non-selection are compelling or persuasive. Additionally, Plaintiff presented ample direct and circumstantial evidence to support that Defendant's adverse personnel action was discriminatory based on her age. Finally, even one year after the non-selection, Plaintiff was still receiving pay raises, cash awards, and positive performance ratings for her work at the EFO. Thus, because the evidence in the record shows that (1) Plaintiff was a qualified, high-performing employee both before and even after a year after the non-selection; and (2) there was no legitimate, non-discriminatory reason for choosing Ms. Davidson over Plaintiff, the Court concludes that Plaintiff has established that her age was the but-for cause of her

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 20

non-selection. Accordingly, Plaintiff has successfully shown that Defendant discriminated against her based on age in violation of the ADEA.

**B.    Retaliation**[1]

The ADEA's federal-sector provision also prohibits retaliation against a federal employee who complains of age discrimination. *Gomez-Perez v. Potter*, 553 U.S. 474, 491 (2008). The U.S. Supreme Court noted that "the ADEA federal-sector provision was patterned directly after Title VII's federal-sector discrimination ban." *Id.* at 487 (internal citation and quotation omitted). Thus, cases interpreting Title VII can be used in ADEA retaliation cases and vice versa. *See Hashimoto v. Dalton*, 118 F.3d 671, 675 n.1 (9th Cir. 1997).

In order to show a claim for retaliation, a plaintiff must show that she (1) engaged in protected activity opposing the defendant's age discriminatory practices; (2) suffered an adverse employment action; and (3) the adverse employment action was because of her participation in a protected activity opposing the defendant's unlawful employment practice. *Yartzoff v. Thomas,* 809 F.2d 1371, 1375 (9th Cir. 1987).

An employee's protected activity can encompass both formal and informal complaints. *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 506 (9th Cir. 2000). However, the protected activity must be in opposition to *the employer's* discriminatory practices. *See Silver v. KCA, Inc.*, 586 F.2d 138,

---

[1] Plaintiff's Complaint alleges a "Retaliation & Hostile Work Environment" claim. ECF No. 1 at 12. However, at trial, Plaintiff's counsel clarified that the hostile work environment allegation is only relevant to the second element of Plaintiff's retaliation claim, rather than being its own independent cause of action. Thus, the Court will only address whether Plaintiff has proved the elements of a retaliation claim under the ADEA.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 21

140-42 (9th Cir. 1978) (holding that employee's opposition to a racially discriminatory act of a co-employee cannot be the basis for a retaliation action)

An adverse employment action is defined as "any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity." *Poland v. Chertoff*, 494 F.3d 1174, 1180 (9th Cir. 2007) (internal quotation omitted).

Finally, a plaintiff must demonstrate that her protected activity was the but-for cause of her adverse employment action in order to prevail on her retaliation claim. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). Causation can be shown through direct and/or circumstantial evidence, which includes (1) the employer's knowledge of the plaintiff's protected activities; and/or (2) the proximity in time between the protected activity and the adverse employment action. *Yartzoff*, 809 F.2d at 1376.

Here, Plaintiff has met her burden in showing that Defendant's disciplinary actions against her—including its decision to ultimately terminate her employment—were because she made complaints against Defendant's age discrimination and retaliation, both internally and through the EEO process.

Plaintiff began engaging in protected activity immediately after her non-selection for the Project Manager position. On May 23, 2016, Plaintiff contacted the Bureau's EEO office, alleging disparate treatment based on sex and age. Kathy Hernandez, an EEO Specialist, then began looking into Plaintiff's allegations.

Defendant admitted that Plaintiff's managers at the EFO learned on or about May 23, 2016, that she had contacted the EEO. Prior to this date, there was no evidence that Plaintiff had ever been subjected to any disciplinary actions. However, after discovering her protected activity, Defendant started subjecting Plaintiff to adverse employment actions. For example, despite previously approving Plaintiff's telework on May 25, 2016, Mr. Ortiz on June 2, 2016,

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 22

suddenly revoked this approval and instead told her that she was first required to seek his permission to telework.

Also, during the week of May 26, 2016, Mr. Ortiz began gathering statements about Plaintiff from other employees at the EFO. Mr. Ortiz did this in response to Ms. Maciel lodging a complaint about Plaintiff regarding the April 19, 2016, verbal altercation. However, Ms. Maciel did not make this complaint until *one month* after the incident and only after Plaintiff complained of age discrimination. This delay in timing is made even more conspicuous by the fact that, just one or two weeks after the altercation, Ms. Maciel entrusted her young children to Plaintiff's care while she was away for a weekend. There was no credible evidence presented as to why Ms. Maciel would feel comfortable asking Plaintiff to take care of her children immediately after the altercation, but then felt the need to file a complaint regarding the altercation over a month later.

Finally, on July 21, 2016, Mr. Ortiz issued a formal Letter of Reprimand to Plaintiff in response to Ms. Maciel's complaint. But these three adverse employment actions—the revocation of Plaintiff's telework, the inexplicably delayed complaint and investigation regarding Plaintiff's conduct, and the Letter of Reprimand—were only the beginning.

From May 2016, when Plaintiff was not selected for the Project Manager position and contacted the EEO, to July 2018, when she was fired, Plaintiff and her managers at the Bureau were locked in an almost endless dispute. Plaintiff would assert claims of age discrimination, retaliation, and hostile work environment. Her managers ignored these claims and instead told Plaintiff that she was acting inappropriately, sending inappropriate emails, and treating her coworkers inappropriately. The evidence presented at trial showed that both sides had good reason to believe that they were correct. However, though Defendant was quick to investigate investigations **about** Plaintiff and used progressive discipline in

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 23

response, Defendant never effectively investigated the allegations **made by Plaintiff**.

For example, on August 25, 2016, Plaintiff filed her formal EEO complaint alleging age discrimination. However, by summer of 2017, the Bureau still had not initiated its investigation, even though EEO investigations are required to be completed within 180 days of the formal complaint. Unfortunately, in July 2017, Mr. Ortiz and another employee in the EFO passed away in unforeseen and unrelated accidents. But, because the EEO investigation had not yet begun, neither Mr. Ortiz nor the other employee were ever interviewed, despite them being directly involved in incidents related to Plaintiff's allegations of age discrimination. Plaintiff's EEO investigation finally commenced on August 9, 2017 and concluded on February 8, 2018—however, to this date, the investigation has not resulted in any conclusions or findings regarding Plaintiff's allegations.

In contrast, towards the end of July 2017, Plaintiff sent some emails in July 2017 regarding a work project that her managers thought were inappropriate. In one of these emails, Plaintiff reiterated her belief that she was being discriminated against based on her age. Mr. Lay immediately intervened to schedule a meeting with Plaintiff to address her inappropriate tone and asked her to submit all the emails she sent related to the work project. When Plaintiff did not submit these emails to Mr. Lay's satisfaction, he initiated disciplinary action. Specifically, by August 14, 2017, not even a month later, Mr. Lay was already working with Kip Stover, a supervisor in the Human Resources department, to draft a letter terminating Plaintiff's employment. This letter was subsequently downgraded to a 3-day suspension letter, which Mr. Lay gave to Plaintiff on September 17, 2017. Meanwhile, during this July-August 2017 time period, Plaintiff continued to complain of age discrimination and retaliation to both Mr. Lay and Lorri Lee, the Regional Director for the Bureau—yet no actions were taken to address Plaintiff's concerns.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 24

The disparity between Defendant's approach to investigating Plaintiff's allegations versus its approach to investigating allegations about Plaintiff is best highlighted by the events in the spring of 2018. On February 26, 2018, Karissa Fromm and Barb Gentry, two of Plaintiff's co-workers in the EFO, submitted hostile work environment complaints against Plaintiff to Mr. Stover. By March 8, 2018, just two weeks later, the Bureau had hired Hayward Reed, an outside private investigator, to investigate Ms. Fromm's and Ms. Gentry's complaints. Mr. Reed performed his investigation from March 14-15, 2018, specifically by interviewing witnesses and gathering affidavits. Mr. Reed then submitted his fact-finding report to Mr. Stover on March 28, 2018, which was then circulated to Plaintiff's managers by April 11, 2018. By May 14, 2018, Marc Maynard, the new Field Office Manager for the EFO who replaced Clint Wertz, issued a proposed removal letter for Plaintiff, which relied in part on the Hayward Reed investigation.

The evidence shows that Defendant was fully capable of initiating and completing an internal investigation into allegations of misconduct at the EFO. However, it did not do so for Plaintiff's complaints of age discrimination and retaliation. Instead, Defendant chose to draw a dividing line between the substance of Plaintiff's allegations and the tone that Plaintiff used to express these allegations, which Defendant believed to be inappropriate.[2]

---

[2] In fact, Defendant admitted as much in Plaintiff's proposed 3-day suspension letter. On page 4 of the letter, Mr. Lay wrote "I am proposing this [suspension] based upon the continued inappropriate manner in which you choose to voice your concerns. I am not prohibiting you from raising concerns. However, there are appropriate processes and forums to do so." Exhibit 605. But, when Plaintiff *tried* to raise her concerns through the "appropriate processes"—namely, by filing an EEO complaint—her complaint went uninvestigated.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 25

Defendant also, either willfully or carelessly, failed to recognize that Plaintiff's increased behavioral issues at work may have been borne out of its own inaction. As stated above, Plaintiff had never experienced any behavioral problems at work prior to her non-selection for the Project Manager position—in fact, she was celebrated and rewarded for her high-quality work. However, after her non-selection, Plaintiff reasonably believed that she had been discriminated against based on age and that she was being retaliated against for saying so. When Plaintiff tried to bring these complaints through the EEO process, her complaint fell into a black hole and languished—uninvestigated and uncompleted—for almost a year after she had filed it. Conversely, when Plaintiff tried to bring these complaints internally to her managers or to Human Resources, she was either told that her complaints were inappropriate and unfounded or that these complaints were more properly under the purview of the EEO process. But at no point did any manager at the Bureau work with Plaintiff to figure out and address the root cause of her behavior changes—instead, Defendant only focused on correcting and disciplining Plaintiff's behavior.

The Court recognizes that every employer has the right to manage and discipline its employees for inappropriate behavior. However, in the present case, Defendant's exercise of this right came at the expense of all its other responsibilities—including its duty to timely investigate and address allegations of discrimination/retaliation and to counsel employees on how to improve their performance before resorting to discipline. By abdicating these other responsibilities, Defendant institutionally failed its core tenet of providing a workplace free from discrimination and retaliation for employees like Plaintiff.

The Court concludes that Plaintiff has established that her protected activity was the but-for cause of her Letter of Reprimand. The evidence presented at trial showed that (1) Defendant learned that Plaintiff had contacted the EEO and (2) Defendant began subjecting Plaintiff to more negative treatment immediately after

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 26

learning this, which is circumstantial evidence of retaliation. *Yartzoff*, 809 F.2d at 1376. Additionally, Mr. Ortiz, when corresponding with Plaintiff about her telework status, even said: "Statements such as: 'Clint said he will not hire a female over 50 again' or 'Clint is building his harem' are negative and will not be acceptable. Any further negative statement of this type will be met with an official disciplinary action." Exhibit 33 at 2. This constitutes direct evidence of retaliation based on Plaintiff's allegations of age discrimination.

The Court also concludes that Plaintiff's protected activity was the but-for cause of her 3-day suspension. Though Plaintiff's July 2017 emails may not have been phrased in the most ideal or professional manner, she was trying to express her reasonably held concern that she was being removed from a project based on age discrimination and retaliation. *See Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021) (stating that a plaintiff need not "show that she was a perfect or model employee" to be protected under anti-discrimination laws). Defendant's 3-day suspension letter even acknowledged that Plaintiff was raising a concern, but—instead of addressing or investigating the concern—Defendant jumped to disciplining Plaintiff's inappropriate tone. In fact, Mr. Lay initially wanted to *terminate* Plaintiff based on these emails, even though Plaintiff had *no* documented behavioral or disciplinary issues in her file other than the July 2016 Letter of Reprimand.

Finally, the Court finds that, given Defendant's policy of progressive discipline, Plaintiff would not have been terminated from her employment in July 2018 had she not had the Letter of Reprimand and 3-day suspension in her file. But because these prior two disciplinary actions were retaliatory, the Court concludes that Defendant's retaliation was the but-for cause of Plaintiff's termination.

Accordingly, Plaintiff has successfully shown that Defendant retaliated against her in violation of the ADEA.

//

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 27

## C.    Remedies

Because Plaintiff has met her burden in showing that (1) age was the but-for cause of her non-selection for the Project Manager position and (2) that her protected activity was the but-for cause of Defendant's retaliation, Plaintiff is entitled to relief redressing the injuries stemming from these employment decisions.

Under the ADEA, a plaintiff can recover back pay in the form of unpaid minimum wages or unpaid overtime compensation. 29 U.S.C. § 626(b). If the plaintiff can show that reinstatement to her former position is not feasible, the plaintiff can also recover front pay. *Cassino v. Reichhold Chems., Inc.*, 817 F.2d 1338, 1347 (9th Cir. 1987); *see also Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001) ("In cases in which reinstatement is not viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement.").

However, an ADEA plaintiff cannot recover nonwage compensatory or punitive damages, such as damages for pain and suffering. *Naton v. Bank of Calif.*, 649 F.2d 691, 698 (9th Cir. 1981). Additionally, any damages award is subject to the plaintiff's duty to mitigate. *Cassino*, 817 F.2d at 1346-47 ("An ADEA plaintiff must attempt to mitigate damages by exercising reasonable care and diligence in seeking re-employment after termination.").

Here, Plaintiff presented testimony from Erick West, a forensic economist. Mr. West calculated that Plaintiff sustained the following economic damages from Defendant's violation:

- Back pay (including unpaid wages/benefits based on both (1) Plaintiff's non-selection for the Project Manager position and (2) Plaintiff's termination): **$352,117**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 28

- <u>Front pay</u> (including lost wages/benefits, pension, and student loan forgiveness): **$928,054**
- <u>Interest/taxes</u>: **$403,180**

The Court accepts Mr. West's calculations. The Court also finds that, due to ongoing hostility and psychological injury to Plaintiff based on Defendant's actions, reinstatement is not appropriate, and Plaintiff is instead entitled to front pay. Finally, the Court finds that Plaintiff mitigated her damages by exercising reasonable care and diligence in seeking re-employment after termination, even though she was ultimately unsuccessful in obtaining another position. Thus, the Court concludes that Plaintiff is entitled to $1,683,351 in monetary damages.

Plaintiff has also requested that the Court award injunctive relief, specifically to (1) strike the reasons for termination from Plaintiff's SF-50; and (2) remove all disciplinary letters from Plaintiff's file, including the Letter of Reprimand, the 3-day suspension, and the termination. The ADEA allows the Court to grant "equitable relief as may be appropriate to effectuate the purposes" of the statute. 29 U.S.C. § 626(b). Here, the Court finds that removing Plaintiff's disciplinary actions, which were tainted by age discrimination and retaliation, is necessary and appropriate to advance the purposes of the ADEA.

Accordingly, **IT IS HEREBY ORDERED:**

1.  The District Court Clerk is directed to enter judgment in favor of Plaintiff.

2.  The Court awards Plaintiff the following remedies:

    a.  $1,683,351 in monetary damages;

    b.  Removal of the reasons for termination in Plaintiff's SF-50;

    c.  Removal of the letters of discipline in Plaintiff's file, including the (1) July 21, 2016 Letter of Reprimand; (2) the November 8, 2017 3-day suspension; and (3) the July 18, 2018 termination letter.

*//*

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 29

3.       Within **twenty-one (21) days** from the date of this Order, the parties shall submit briefing to the Court on the amounts of attorneys' fees and litigation costs. Plaintiff is directed to file affidavits and a memorandum setting forth the legal basis and justifications for any amount requested.

**IT IS SO ORDERED**. The District Court Clerk is hereby directed to enter this Order and to provide copies to counsel.

**DATED** this 12th day of April 2022.



Stanley A. Bastian
Chief United States District Judge

**FINDINGS OF FACT AND CONCLUSIONS OF LAW** # 30